UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

CAREER MATCHING PLATFORM, INC.,

                              Debtor.

NOT FOR PUBLICATION

Case No. No. 24-10792 (MG)

Chapter 11
Subchapter V

**MEMORANDUM OPINION AND ORDER APPROVING KIRBY AISNER & CURLEY, LLP'S FINAL APPLICATION FOR ALLOWANCE OF PROFESSIONAL COMPENSATION AND REIMBURSEMENT OF EXPENSES**

*A P P E A R A N C E S:*

KIRBY AISNER & CURLEY, LLP
*Former Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
By:    Dawn Kirby, Esq.

CERTILMAN BALIN ADLER & HYMAN, LLP
*Attorneys for the Debtor*
90 Merrick Avenue, 9th Floor
East Meadow, New York 11554
By:    Robert D. Nosek, Esq.

WILLIAM K. HARRINGTON
*United States Trustee for Region 2*
*U.S. Department of Justice*
One Bowling Green
New York, New York 10707
By:    Daniel Rudewicz, Esq.


**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Final Application for Allowance of Professional Compensation and Reimbursement of Expenses of Kirby Aisner & Curley, LLP Attorneys for the Debtor for the Period of May 7, 2024 through August 9, 2024* (the "KAC Application"). (ECF Doc. # 41.) Through the KAC Application, Kirby Aisner & Curley, LLC ("KAC" or the "Applicant") seeks entry of an order seeking final approval and allowance of professional fees pursuant to Bankruptcy Code Sections 330 and 503(b), covering services rendered by the Applicant to the Debtor from May 7, 2024 through August 9, 2024 (the "Fee Period"), consisting of fees in the amount of $ 18,670.00 plus reimbursement of actual and necessary expenses incurred by KAC during the Fee Period in the amount of $ 1,851.95. KAC requests that the Court permit it to apply the balance of its $17,745.00 retainer to its billing, which is inclusive of the $1,738 filing fee KAC paid on the Debtor's behalf. (Response ¶ 18). Although the KAC Application request exceeds the retainer by $2,776.95, KAC offered to the Debtor to voluntarily reduce the request by that amount. (*Id.*)

On August 28, 2024, the Debtor filed an objection (the "Objection") to the KAC Application (ECF Doc. # 51) through its new counsel, Certilman Balin Adler & Hyman, LLP ("CBAH"). On March 11, 2026, the Court entered an *Order to Show Cause Why Motion Should Not Be Withdrawn for Failure to Prosecute* after being inactive for more than a year (the "Order to Show Cause," ECF Doc. # 86). On March 18, 2026, the Debtor filed a response (the "Response," ECF Doc. # 87). On April 15, 2026, KAC filed a reply (the "Reply," ECF Doc. # 90.) A hearing was held April 22, 2026 at 10:00 a.m.

For the reasons outlined below, the Court **APPROVES** the final fees and expenses requested and allows KAC to apply the balance of its $17,745.00 retainer to its billing.

## I.   BACKGROUND

### A.  KAC Retention

On May 31, 2024, the Court entered the *Order Authorizing and Approving Retention of KAC as Attorneys for the Debtor as of May 7, 2024* (ECF Doc. # 21).  KAC received a retainer payment from the Debtor for a non-bankruptcy out of-court workout representation in the amount of $5,000 on April 15, 2024.  (KAC App. ¶ 43.)  The Debtor subsequently determined it wished to file a chapter 11 case resulting in a chapter 11 retainer payment on May 6, 2024 in the amount of $21,738.00 (inclusive of the $1,738 filing fee).  (*Id.*)  Prior to the Petition Date, Applicant's fees and expenses totaled $8,993.00, leaving the Applicant with a net retainer as of the Petition Date in the amount of $17,745. (*Id.*)

### B.  The Objection

On July 18, 2024, CBAH was substituted as counsel of record in place of KAC pursuant to the *Stipulation and Order Granting Substitution of Counsel*.  (ECF Doc. # 30.)  On August 9, 2029, KAC filed the KAC Application with a hearing scheduled for September 4, 2024.  (KAC App. at 1.)  On August 28, 2024, the Court entered the retention order for CBAH. (ECF Doc. # 49.)

On August 28, 2024, the Debtor filed the Objection to the KAC Application through its new counsel, CBAH.  (Objection at 1.)  The Objection asserts that KAC failed to communicate with secured creditor Goodman Capital Finance ("Goodman"), which had a pre-petition factoring agreement with the Debtor.  (Objection ¶ 7.) The Debtor asserts that KAC failed to communicate concerning cash collateral issues, putting the Debtor in an "unfavorable" position with Goodman that "caused the Debtor to lose a $ 2 million dollar credit facility." (*Id.*)  See below for the full text:

After the bankruptcy filing, Goodman contacted Rozman[1] and advised that they had been trying to contact Kirby for over three (3) weeks to obtain a cash collateral order and motion in place to no avail.[2]  Goodman advised that they instructed their counsel to file a Motion to Lift the Stay to permit Goodman to collect and apply proceeds of accounts receivable and prevent the Debtor from using cash collateral thereby not providing the Debtor with ongoing financing. . . . Upon information and belief, this delay by Kirby put the Debtor in an unfavorable position with Goodman and caused the Debtor to lose a $2 million dollar credit facility.

(Objection ¶ 7.)

The Debtor additionally alleges that KAC did not inform the Debtor of the filing of *Goodman's Motion for Relief from Stay* (the "Lift Stay Motion," ECF Doc. # 22) until almost a month after it was filed.[3]  (Objection ¶ 8.)  The *Order Granting Goodman Capital Finance Relief from Automatic Stay* (the "Lift Stay Order," ECF Doc. # 26) was entered on July 2, 2024. Immediately after, CBAH commenced settlement discussions with Goodman and on September 5, 2024, the Court entered an order approving a stipulation resolving Goodman's claims (the "Stipulation," ECF Doc. # 46; the "Stipulation Order," ECF Doc. # 54).  Under the Stipulation, Goodman received a lump sum of $100,000, resolving Goodman's claim of approximately $143,790.00 incurred under the pre-petition factoring agreement as of July 30, 20204.

(Stipulation ¶ 1.)  According to the Debtor:

Upon information and belief, the lack of communication of Debtor's prior counsel with Goodman, the Debtor was responsible for a large amount of attorney's fees that Goodman incurred.  The substantial sum of attorney's fees Goodman incurred, that the Debtor was responsible for paying, could have been avoided if the Debtor's relationship had not deteriorated with Goodman and Kirby timely communicated with Goodman.  Upon information and belief, Kirby failed to provide adequate advice to the Debtor as it pertained to the Goodman Agreement and failed to advise Rozman of certain consequences of the Goodman Agreement including being responsible for Goodman's legal fees, which were largely increased due to Kirby's failure to communicate with Goodman.

---

[1]     Rozman is the CEO of Career Matching Platform Inc.
[2]     This communication occurred June 10, 2024.  (Objection, Ex. A at 1.)
[3]     The Motion for Relief from Stay was filed June 22, 2024.  (Lift Stay Motion at 1.)

4

(Objection ¶ 9.)

Based on these arguments, the Debtor objects to KAC's fees as unreasonable. (Objection ¶ 14.)

### C. Order to Show Cause

On March 11, 2026, the Court entered the Order to Show Cause why the KAC Application should not be withdrawn for failure to prosecute after being inactive for more than a year. (Order to Show Cause at 1.)

### D. Response

On March 18, 2026, the KAC filed the Response. (Response at 1.) The Response addresses the inactivity noting that during the period both sides made good faith settlement offers. (Response ¶ 9.) KAC further outlines that the Debtor has not found counsel willing to pursue claims against KAC:

> In January 2025, CBAH proposed that KAC restore its Motion to the calendar. In the meantime, CBAH expressed that it had declined to pursue any alleged damage claim against KAC, as asserted by the Debtor's principal, but had provided the Debtor's principal the opportunity to find alternate counsel willing to potentially pursue the principal's perceived claims. Thereafter, KAC was asked to continue its motion without date. Upon information and belief, the Debtor's principal did not provide CBAH with any potential counsel willing to pursue any claims.

(Response ¶¶ 10-11.)

Negotiations continued through August 2025, and KAC "was asked not to restore its Motion." (*Id.* ¶¶ 12-13.) "Only a short time ago," CBAH informed KAC that a resolution did not appear possible and KAC intended to restore the KAC Application. (*Id.* ¶¶ 14-15.)

### E. Reply

On April 15, 2026, KAC filed the Reply. (Reply at 1.) KAC disputes the Debtor's allegations of KAC's lack of communication and asserts that the "extreme difficulty providing a 13-week budget for the Secured Creditor's review, which was an impediment to finalizing an

5

agreement" was caused by communication issues on the Debtor's end.  (Reply ¶ 3.) ("It was due to these difficulties with providing a proficient budget that the process of finalizing the cash collateral stipulation took longer than usual.")  (*Id.* ¶ 10.)  Attached to the Reply, KAC includes a summary of some of KAC's communications with the Debtor, the Secured Creditor, the Subchapter V Trustee and the US Trustee (the "KAC Synopsis of Communications," Reply Ex. A) and samples of email correspondence (the "KAC Emails," Reply Ex. B). (Reply ¶ 4.)  KAC asserts that the communications show "KAC was in constant contact with Mr. Rozman on cash collateral issues as well as updating the creditor list he originally provided which was incorrect." (*Id.* ¶ 5.)

The KAC Synopsis of Communications and KAC Emails indicate that May 10, 2024, Otterbourg, Counsel for Goodman, reached out to KAC identifying themselves as counsel and stating that they would like to speak as soon as possible about the cash collateral motion.  (KAC Synopsis of Communications ¶ e.)  Within three days, the parties had met via phone to discuss consensual use of cash collateral.  (*Id.* at ¶¶ f, g.)

The Lift Stay Motion was filed June 10, 2024.  (Lift Stay Motion at 1.)  On June 18, 2024, KAC provided the Debtor with budget questions from Goodman.  (*Id.* at ¶ u.)  After repeatedly following up, KAC noted they needed the projections ASAP to communicate with Goodman's attorneys.  (*Id.* at ¶ x.)

July 1, 2024 Goodman sent the following to KAC:

[I]n light of Debtor's non-responsiveness and its use of cash collateral without a Court order over the course of the past approximately six weeks since the draft interim cash collateral order dated May 16, 2024 attached to your email (and reattached here) was originally negotiated, which draft interim order originally was contemplated to cover only a short period of time, the current draft of the order will not work for Goodman.  Once we have received the requested information from your client, we will be in a better position to determine what Goodman will or will not consent to and what additional terms may need to be added to any consensual

order.  Lastly, we note that many of our questions on the prior budget that we sent on May 17 still apply to the revised budget, and the revised budget raises additional questions.

(*Id.* at ¶ dd.)

On July 3, 2024, Goodwin sent KAC a revised interim cash collateral order "consistent with [their] recent discussions."  (*Id.* at ¶ mm.)

## II.    **LEGAL STANDARD**

The court may award fees to professional persons pursuant to section 330 of the Bankruptcy Code.  11 U.S.C. § 330.  Section 330 provides in relevant part:

> After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328 and 329, the court may award . . .
>
> (A)   reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
>
> (B)   reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

In determining reasonable compensation, Section 330 directs the court to consider:

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time which the services were rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

Whether services are necessary is determined from the perspective of the time at which the services were rendered.  3 COLLIER ON BANKRUPTCY ¶ 330.04[1][b][iii] (16th ed. rev. 2013). In the Second Circuit, the "necessary" standard in section 330 is given a broad interpretation. Generally, services are "necessary" if they benefit the estate.  *In re Keene Corp.,* 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).  The test considers whether services provided were "reasonably likely to benefit the estate" and is an objective test, taking into consideration services that a reasonable lawyer would have performed under the same circumstances.  *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996).

The court has an independent duty to review fee applications and evaluate the compensation requested.  *In re Keene*, 205 B.R. at 695.  The court may reduce or disallow a request if the services provide no real benefit to the estate.  (*Id.* at 696.)  The court may also reduce compensation if the request is based on incomplete or inaccurate time records.  *In re Hamilton Hardware Co.*, 11 B.R. 326 (Bankr. E.D. Mich. 1981).  Entries in a time-keeping record must offer more than simple cursory details as a court must have sufficient detail to assess the necessity of the activity and the reasonableness of the time spent on the activity.  *See, e.g.*, *In re Baker*, 374 B.R. 489, 494 (Bankr. E.D.N.Y. 2007).

Fee applications must also comply with Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "FRBP"), which requires "a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested."  FED. R. BANKR. P. 2016. Bankruptcy Rule 2016 requires disclosure of any payments previously made to the applicant and of the existence of any compensation agreement between the applicant, their client and any third party who will share the compensation.  (*Id.*)

In addition, S.D.N.Y. Local Bankruptcy Rule 2016 requires those seeking awards of compensation and/or reimbursement of expenses on behalf of a professional to comply with certain guidelines and requirements promulgated by the Court.  Among other things, interim fee applications for professionals seeking compensation pursuant to sections 327, 328, 330, and 331 of the Bankruptcy Code "must comply with the Amended Guidelines for Fees and Disbursements for Professionals Southern District of New York Bankruptcy Cases." (the "M-447 Order" or the "NYSB Amended Guidelines").  S.D.N.Y.R. 2016-1(a).  The NYSB Amended Guidelines set forth in General Order M-447, which supersedes General Order M-389, provides "clear and concise procedures for compensation and reimbursement expenses."  *See* General Order M-447, *available at* https://www.nysb.uscourts.gov/sites/default/files/m447.pdf. Specifically, the M-447 Order requires certifications by the professional responsible for compliance with the NYSB Amended Guidelines that the fee application has been read, that the application and the fees therein comply with the NYSB Amended Guidelines, that the fees are billed at rates customary to the applicant and generally accepted by the applicant's clients, and that the applicant does not make a profit on the service provided.  (*Id.* at 5.)  The application must also contain certifications of service upon and approval of the fee application by the trustee, the debtor, or the chair of each official committee.  (*Id.*) These certifications must contain a list of all professionals and paraprofessionals working on a given case, aggregate hours spent by each professional, and "a reasonably detailed breakdown of the disbursements incurred and an explanation of billing practices."  (*Id.*)

General Order M-447 contains the Court's own guidelines regarding disbursements and no longer follows the U.S. Trustee's guidelines.  These requirements establish maximums of $0.10 per page for photocopies (or cost, whichever amount is lower); limits on meals to $20.00

per person, and for meals earlier than 8:00 p.m., reimbursement only if there is an additional 1 ½ hours of work expended after the dinner; and limits on overtime expenses for non-professional and paraprofessional staff unless fully explained and justified, which should include an indication that services were absolutely necessary. (*Id*. at 6.)

Since fee applications are required under the Bankruptcy Code, courts may award fees for time spent in actually preparing a fee application "based on the level and skill reasonably required to prepare the application." 11 U.S.C. § 330(a)(6); *see also In re Mesa Air Grp., Inc.*, 449 B.R. 441, 444 (Bankr. S.D.N.Y. 2011); *In re Bennett Funding Grp., Inc.*, 213 B.R. 234, 249 (Bankr. N.D.N.Y. 1997) ("It is proper . . . for the bankruptcy court to examine the amount and value of the time spent preparing the fee application, and reasonable limits may be placed on compensation for such work."). While fee caps are not found in the NYSB Amended Guidelines or in the Bankruptcy Code, courts have frequently imposed them, typically in the 3-5% range. *See Mesa Air*, 449 B.R. at 444 (collecting cases). Where a professional's fees are greater in the aggregate, the fees attributable to fee applications should generally fall at the lower end of the range, while a professional seeking a lower overall fee allowance may be permitted to collect fees attributable to fee applications at the upper end of the range.

Professionals submitting fee applications must also comply with the U.S. Trustee's Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases, https://www.justice.gov/sites/default/files/ust/legacy/2013/06/28/Fee_Guidelines.pdf (the "UST Guidelines"). Pursuant to the UST Guidelines, each professional is directed to answer a set of questions relating to its fee application. (*Id.* § C.5.) Of particular note, the question located in subparagraph (d) provides:

Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices? (This is limited to work involved in preparing and editing billing records that would not be compensable outside of bankruptcy and does not include reasonable fees for preparing a fee application.) If so, please quantify by hours and fees.

(*Id.* § C.5.d.)

### III. <u>DISCUSSION</u>

For the Fee Period from May 7, 2024, through August 9, 2024, KAC seeks $ 18,670.00 in fees and $ 1,851.95 in expense reimbursements. (KAC App. ¶ 44.) KAC requests that the Court permit it to apply the balance of its $17,745.00 retainer to its billing, which is inclusive of the $1,738 filing fee KAC paid on the Debtor's behalf. (Reply ¶ 17). Although the KAC Application request exceeds the retainer by $2,776.95, KAC "long ago" offered to the Debtor to voluntarily reduce the request by that amount. (*Id.* ¶ 18.) A hearing was held April 22, 2026 at 10:00 a.m. For the reasons outlined below, the Court **APPROVES** the final fees and expenses requested and allows KAC to apply the balance of its $17,745.00 retainer to its billing.

#### A. Fees for the Fee Period

For KACs Fee Period, KAC professionals—inclusive of attorneys and paraprofessionals—worked a total of 56.00 hours, with a blended hourly rate of $333.39, amounting to $18,670.00 in total fees. (KAC App., Ex. B at 2.)

KAC includes the following summary of hours worked and fees requested, broken down by project category:

**SECTION I**
**FEE SUMMARY**

| | | |
|---|---|---|
| TOTAL PREVIOUS FEES & COSTS REQUESTED: | $ | 0.00 |
| TOTAL FEES & COSTS ALLOWED TO DATE: | $ | 0.00 |
| TOTAL RETAINER (IF APPLICABLE) | $ | 21,738.00 |
| TOTAL HOLDBACK (IF APPLICABLE) | $ | 0.00 |
| TOTAL INTERIM PAYMENTS RECEIVED BY APPLICANT | $ | 0.00 |
| TOTAL RECEIVED BY APPLICANT | $ | 0.00 |

**PROFESSIONAL SERVICES SUMMARY**

| NAME OF PROFESSIONAL & TITLE | | RATE | HOURS | FEE |
|---|---|---|---|---|
| Dawn Kirby | Partner | $150 - $575 | 21.2 | $ 12,105.00 |
| Khyati Tuli | Law Clerk | $200 | 26.9 | $ 5,380.00 |
| Bryn Leonardo | Paralegal | $150 | 4.9 | $ 735.00 |
| Donna Fraioli | Paralegal | $150 | 1.2 | $ 450.00 |
| **TOTAL** | | | **56** | **$ 18,670.00** |

**COMPENSATION BY WORK TASK**

| TASK CODE | DESCRIPTION | HOURS | FEE |
|---|---|---|---|
| 04 | General Case Administration | 7.1 | $ 2,935.00 |
| 05 | Claims Administration and objections | 1.7 | $ 340.00 |
| 07 | Fee/Employment Applications | 4.4 | $ 1,155.00 |
| 11 | Meeting of Creditors/341A | 13.9 | $ 4,730.00 |
| 12 | Plan and Disclosure Statement | 1.0 | $ 200.00 |
| 13 | Relief from Stay Proceedings | 0.3 | $ 172.50 |
| 14 | Schedules/SOFA | 11.8 | $ 2,665.00 |
| 15 | Operating Statements | 3.5 | $ 975.00 |
| 16 | Cash Collateral | 12.3 | $ 5,497.50 |
| **TOTAL** | | **56** | **$ 18,670.00** |

| | | |
|---|---|---|
| **APPLICATION FEE TOTALS - Page 2** | $ | 18,670.00 |
| **APPLICATION DISBURSEMENT TOTALS - Page 3** | $ | 1,851.95 |
| **BLENDED HOURLY RATE** :** | $ | 333.39 |

(Fee App., Ex. B at 2.)

KAC attached timesheets to its application.  (KAC App., Ex. B at 5-8.)  The timesheets do not contain block billing, are adequately detailed, and indicate that the work has been done materially in accordance with the applicable guidelines and in a reasonable and prompt manner. According to the timesheets KAC engaged in the following activities:

1.  Counseled the Debtor's Principal;
2.  Prepared and filed the Petition, Schedules, and SOFAs;
3.  Prepared Principal for and attended the 341(a) meeting;
4.  Helped Principal with administrative matters such as opening a DIP account;
5.  Worked with Debtor's counsel on preparing monthly operating reports;
6.  Filed a bar date application and obtained bar date;
7.  Filed a 1007 Motion;
8.  Conferenced with Chapter Subchapter V Trustee;
9.  Filed a retention application which was entered;
10.  Worked to negotiate terms of the Cash Collateral Order.

(KAC App., Ex. B at 5-8.)

The UST had no objections to the KAC Application.  The Debtor objects to KAC's fees as unreasonable.  (Objection ¶ 14.)  Outside of the cash collateral efforts, the Debtor does not object to KAC's involvement in any of the other mentioned activities.  The Debtor's primary assertions involving cash collateral communications are as follows:

> After the bankruptcy filing, Goodman contacted Rozman and advised that they had been trying to contact Kirby for over three (3) weeks to obtain a cash collateral order and motion in place to no avail. Goodman advised that they instructed their counsel to file a Motion to Lift the Stay to permit Goodman to collect and apply proceeds of accounts receivable and prevent the Debtor from using cash collateral thereby not providing the Debtor with ongoing financing. . . Upon information and belief, this delay by Kirby put the Debtor in an unfavorable position with Goodman and caused the Debtor to lose a $2 million dollar credit facility.

(Objection ¶ 7.)

> **Upon information and belief, the lack of communication of Debtor's prior** counsel with Goodman, the Debtor was responsible for a large amount of attorney's fees that Goodman incurred. The substantial sum of attorney's fees Goodman incurred, that the Debtor was responsible for paying, could have been avoided if the Debtor's relationship had not deteriorated with Goodman and Kirby timely communicated with Goodman. Upon information and belief, Kirby failed to provide adequate advice to the Debtor as it pertained to the Goodman Agreement and failed to advise Rozman of certain consequences of the Goodman Agreement including being responsible for Goodman's legal fees, which were largely increased due to Kirby's failure to communicate with Goodman.

(Objection ¶ 9.)

Given the volume of documentation that KAC provided about cash collateral communications with the Debtor and with Goodman (through their counsel, Otterbourg), an argument that KAC failed to communicate around the topic is unconvincing.  (*See* KAC Synopsis of Communications and KAC Emails.)  Indeed, KAC argues that communication issues on the *Debtor's* end caused "extreme difficulty providing a 13-week budget for the Secured Creditor's review, which was an impediment to finalizing an agreement."  (Reply ¶ 3.)

13

A pertinent timeline follows:

1. May 7, 2024: Debtor files for bankruptcy.  (ECF Doc. # 1.)

2. June 10, 2024:  Goodman emails Debtor that they have been trying to contact KAC "for over three (3) weeks to obtain a cash collateral order and motion in place to no avail."  (Objection ¶ 7.)

3. June 18, 2024: KAC provides the Debtor with budget questions from Goodman.  (KAC Synopsis of Communications ¶ u.)

4. June 22, 2024: The Lift Stay Motion is filed.  (Lift Stay Motion 1.)

5. July 2, 2024: The Lift Stay Order is entered. (Lift Stay Order 1.)

6. July 1, 2024: Goodman sends an email to KAC stating that, "in light of Debtor's non-responsiveness and its use of cash collateral without a Court order over the course of the past approximately six weeks since the draft interim cash collateral order dated May 16, 2024 attached to your email (and reattached here) was originally negotiated, which draft interim order originally was contemplated to cover only a short period of time, the current draft of the order will not work for Goodman. Once we have received the requested information from your client, we will be in a better position to determine what Goodman will or will not consent to and what additional terms may need to be added to any consensual order. Lastly, we note that many of our questions on the prior budget that we sent on May 17 still apply to the revised budget, and the revised budget raises additional questions." (KAC Synopsis of Communications at ¶ dd.)

7. July 3, 2024: Goodwin sends KAC a revised interim cash collateral order "consistent with [their] recent discussions."  (*Id.* at ¶ mm.)

8. July 11, 2024: The Interim Cash Collateral Order is entered.  (ECF Doc. # 28.)

9. July 18, 2024: CBAH is substituted as counsel of record in place of KAC. (ECF Doc. # 30.)

10. September 5, 2024: the Court enters the Stipulation Order.  (Stipulation Order at 1.)

Most notably, while the Debtor includes June 10, 2024, correspondence from Goodman indicating that KAC had not been communicative, KAC includes later correspondence from July 1, 2024 where Goodman cites the Debtor's non-responsiveness.  The correspondence additionally highlights that the Debtor had not provided answers to questions from Goodman that KAC provided weeks earlier.  KAC includes correspondence indicating drafts of the cash collateral motion went back and forth between Goodman and KAC, indicating their cooperation ahead of the Interim Cash Collateral Order being filed.  Ahead of the substitution of counsel, communications between Goodman, KAC, and the Debtor reflect Goodman and KAC working

14

together to successfully file and Interim Cash Collateral Motion, even as the Debtor failed to provide necessary budget information.  Additionally, the tone remained professional between Goodman and KAC, without evidence of a breakdown in the relationship.

Until recently, the Debtor and KAC were engaged in good-faith settlement negotiations, giving rise to over a year of inactivity on the docket.  (Response ¶¶ 9-11.)  Approving the fee application does not prevent the Debtor from bringing a claim against KAC.  However, they are unlikely do so given that in January 2025, "CBAH expressed that it had declined to pursue any alleged damage claim against KAC, as asserted by the Debtor's principal, but had provided the Debtor's principal the opportunity to find alternate counsel" and ultimately "did not provide CBAH with any potential counsel willing to pursue any claims."  (*Id.* ¶¶ 10-11.)

While the relationship between the Debtors and KAC broke down to the point that the Debtor sought new counsel, the Debtor does not get a free pass on services rendered by counsel where counsel performed the services and fees are reasonable.  Here, KAC has adequately shown they were engaged in cash collateral communications with Debtor and with Goodman.  The scope of duties performed over the period of fifty-six billable hours appears reasonable.  Additionally, the Debtor has not pursued claims against KAC and remains free to do so.  The Court **OVERRULES** the Debtor's objection and **APPROVES** the fees.

**B. Expenses for the Second Interim Period**

For KAC's Fee Period, KAC seeks approval of $1,851.95 in expenses.  (KAC App. ¶ 44.)

The KAC Application includes the following summary of expenses, broken down by category:

| Date | Type | Description | Quantity | Price | Total |
|---|---|---|---|---|---|
| 8/9/2024 | Expense entry | Filing Fees | 1 | $ 34.00 | $ 34.00 |
| 5/7/2024 | Expense entry | Filing Fees | 1 | $1,738.00 | $1,738.00 |
| | | Total | | | $1,772.00 |
| 7/1/2024 | Expense entry | June - On-line Access of Court Records | 37 | $ 0.10 | $ 3.70 |
| 7/1/2024 | Expense entry | June - On-line Access of Court Records | 12 | $ 0.10 | $ 1.20 |
| 5/7/2024 | Expense entry | On-line Access of Court Records | 37 | $ 0.10 | $ 3.70 |
| 5/8/2024 | Expense entry | On-line Access of Court Records | 40 | $ 0.10 | $ 4.00 |
| 5/8/2024 | Expense entry | On-line Access of Court Records | 30 | $ 0.10 | $ 3.00 |
| 5/9/2024 | Expense entry | On-line Access of Court Records | 3 | $ 0.10 | $ 0.30 |
| 5/21/2024 | Expense entry | On-line Access of Court Records | 41 | $ 0.10 | $ 4.10 |
| 7/2/2024 | Expense entry | On-line Access of Court Records | 11 | $ 0.10 | $ 1.10 |
| | | Total | | | $ 21.10 |
| 5/29/2024 | Expense entry | Postage | 36 | $ 0.88 | $ 31.68 |
| | | Total | | | $ 31.68 |
| 5/8/2024 | Expense entry | UPS | 1 | $ 27.17 | $ 27.17 |
| | | Total | | | $ 27.17 |
| | | Grand Total | | | $1,851.95 |

(KAC App., Ex. B at 9.)  The costs related to filings, PACER, and postage are reasonable and

contain detailed information.  In general, it conforms with Order M-447 and the UST Guidelines.

Additionally, the Debtors did not object to the expenses as part of the Objection.  Therefore, the

Court **APPROVES** KAC's requested expense reimbursement of $1,851.95.

In sum, the Court **APPROVES** the final fees and expenses requested and allows KAC to

apply the balance of its $17,745.00 retainer to its billing.

## IV. <u>CONCLUSION</u>

For the reasons explained above, the Court **APPROVES** the final fees and expenses

requested and allows KAC to apply the balance of its $17,745.00 retainer to its billing.

**IT IS SO ORDERED.**

Dated:    April 27, 2026
          New York, New York

_Martin Glenn_
_____
MARTIN GLENN
Chief United States Bankruptcy Judge